14-1753-cv
*Adam Wiercinski v. Mangia 57, Inc., et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

August Term, 2014

No. 14-1753-cv

ADAM WIERCINSKI,
*Plaintiff-Appellant,*

*v.*

MANGIA 57, INC., SASHA MUNIAK, ARTUR ZBOZIEN, MALGORZATA
CYMANOW, GRZEGORZ SAROSIEK, ROBERT BAZGIER, AND DARIUSZ
MASLANKA,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the Eastern District of New York.
No. 09-cv-4413 (ILG) — I. Leo Glasser, *Judge.*

————

Submitted: February 6, 2015
Decided: May 21, 2015

————

Before: PARKER, HALL, and LIVINGSTON, *Circuit Judges.*

————

Plaintiff-appellant Adam Wiercinski appeals from a judgment
of the United States District Court for the Eastern District of New
York (I. Leo Glasser, *Judge*).  The jury returned a verdict in favor of

Wiercinski on his claim of hostile work environment in violation of 42 U.S.C. § 1981 and awarded him nominal damages of $1 and punitive damages of $900,000. Following the verdict, defendants-appellees moved pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for remittitur of the jury's punitive damages award, or in the alternative, for a new trial on punitive damages, while Wiercinski applied for fees and costs. The district court vacated the jury's liability verdict and denied Wiercinski's application for fees. We AFFIRM the district court's ruling only to the extent that it vacated the award of punitive damages. We REVERSE the district court's denial of Wiercinski's application for fees and costs, and REMAND for the calculation and award of appropriate fees.

————

MATTHEW J. BLIT, Levine & Blit, PLLC, New York, NY, *for Plaintiff-Appellant Adam Wiercinski*.

DANIEL J. KAISER (Henry L. Saurborn, Jr., *on the brief)*, Kaiser Saurborn & Mair, P.C., New York, NY, *for Defendants-Appellees Mangia 57 Inc., Sasha Muniak, Artur Zbozien, Malgorzata Cymanow, Grzegorz Sarosiek, Robert Bazgier, and Dariusz Maslanka*.

————

BARRINGTON D. PARKER, *Circuit Judge*:

Adam Wiercinski, a Polish man of Jewish descent, immigrated to the United States in 1981 with the assistance of Rav-Tov International Jewish Rescue Organization ("Rav-Tov"), a community organization helping Jews resettle in Israel and the United States. Starting in approximately 1984 and continuing until December 2007, Wiercinski worked as a deliveryman for Mangia, a food catering company with several locations in Manhattan.[1] All Mangia locations

---

[1] For purposes of this opinion, "Mangia" refers either to the umbrella entity, or to the appellees. All references to specific Mangia locations will include the branch name.

are owned by Sasha Muniak. Malgorzata Cymanow, Muniak's sister, served as the general manager of all Mangia locations throughout the period of Wiercinski's employment.

There were only two notable breaks in Wiercinski's employment by Mangia during this 23 year period. Wiercinski left the Mangia 56 location in approximately 1989 and worked as a security officer until he returned to work at the Mangia 48 location in 1992. In 1998, Wiercinski was fired by his manager at the Mangia 48 location, allegedly because of that manager's anti-Semitism. Shortly thereafter Wiercinski asked his friend and Rav-Tov sponsor, Zindel Zelmanovitch, to help him get his job back. Zelmanovitch approached Muniak and Cymanow and convinced them to rehire Wiercinski. They did so and Wiercinski then worked at Mangia's Wall Street branch.

In 1999, Wiercinski asked Zelmanovitch to help him transfer from the Wall Street location to the Mangia 57 location because it "was the busiest location in the midtown" and Wiercinski believed he would "be able to earn some decent money" at that branch. JA 89, 91. Wiercinski worked at Mangia 57 until he took an extended leave of absence to visit family in Poland in late 2007. When he returned in early 2008, he asked to be rehired at Mangia and was rejected.

In October 2009, Wiercinski sued Mangia 57 and six individual defendants (together, "Mangia"), alleging discrimination on the basis of religion and national origin, retaliation, conspiracy, wrongful termination, and violation of various New York State and City laws. Wiercinski alleged that a night shift manager, Artur Zbozien, verbally harassed and abused him with anti-Semitic slurs such as "stinking jew," "dirty Jew," "Jewish pederast," and "kike" throughout Wiercinski's eight year period of employment at Mangia

57.  In October 2013, following several years of motion practice, the parties proceeded to trial on Wiercinksi's sole remaining claim – hostile work environment under Section 1981.

The evidence presented by both sides was almost entirely testimonial. Wiercinski recounted multiple instances of Zbozien's harassing conduct.  For example, Wiercinski testified that on the first day of work, he accidentally bumped into Zbozien while carrying boxes, to which Zbozien responded, "did anybody ever fuck you up, you stupid fucking Jew." JA 93.  Wiercinski also said that, on several occasions, Zbozien paid out Wiercinski's tips in pennies and threw them on the floor.  JA 96-97.  Wiercinski recalled that Zbozien sometimes passed gas in front of him, laughed, and said, "here is your Zyklon B that was used to gas Jews in the concentration camps." JA 100.  According to Wiercinski, Zbozien used anti-Semitic slurs "at least a dozen times" over the eight years during which Wiercinski worked at Mangia 57.  JA 102.

Wiercinski also introduced testimony from three former co-workers, who testified in detail about the specific instances described above and explained that Wiercinski commonly complained to them and others about the anti-Semitic slurs he was subject to.  *See, e.g.*, JA 106-107, 179-180, 195, 202.  Nevertheless, Wiercinski admitted that he never looked for another job during the eight years of harassment from Zbozien, and in fact, asked to be transferred to Zbozien's night shift, a request that Mangia granted.

Wiercinski testified that he complained to Cymanow about the harassment "on several occasions, but then she always discouraged [him] [from] com[ing] back."  JA 109.  According to Wiercinski, he spoke with Cymanow "at least ten times" about Zbozien and other individuals "calling [him] dirty names about [his] Jewish religion."  JA 110.  The only result of these conversations,

according to Wiercinski, was Cymanow's decision to transfer Zbozien to Mangia Wall Street. Zbozien returned to Mangia 57 approximately three weeks later. Shortly after Zbozien returned, Wiercinski was transferred to a different shift, again apparently upon his own request. *See* JA 366-367 (8/8/07 affidavit of Artur Zbozien) ("Wiercinski was transferred to work on the day shift, while I continued to work the night shift. Since then, I have had very limited contact with [him]."); JA 108 (testimony of Wiercinski) ("At th[e] time [that Zbozien returned] I think I was off the night shift. . . . I quit the night shift and became [a] part-time delivery person"). According to Wiercinski, Cymanow was herself "known for being anti-Semitic," although his only specific allegation of such behavior was her occasional use of a Polish term for Jews that Wiercinski characterized as "not very derogatory." JA 124. Other than these alleged complaints to Cymanow, Wiercinski testified that he commonly complained to his coworkers and brought the issue to Muniak's attention in 2007. Wiercinski stated that as a result of Zbozien's harassment, he suffered from depression, anxiety, and sleep issues, although he did not present any medical evidence as to these problems.

On cross-examination, Mangia undertook to impeach Wiercinski's credibility but was thwarted as a result of his repeated invocation of the Fifth Amendment privilege against self-incrimination. Specifically, Wiercinski invoked the Fifth Amendment privilege when cross-examined about his use of a different name for payroll purposes while at Mangia, his failure to report income earned at Mangia on tax returns, his application for and receipt of Social Security and other public assistance benefits without reporting income earned at Mangia, and his failure to report income earned at Cucina, a catering company where Wiercinski

worked after his termination in 2007.[2]  *See* JA 125-131, 134-136, 153-159.  Although Mangia was, at times, able to impeach Wiercinski using prior deposition testimony, *see, e.g.*, JA 130 (Wiercinski deposition testimony admitting that he used a different name to receive income earned at Mangia in order to conceal it from government authorities), its ability to present a defense was significantly hampered by Wiercinski's obstructive behavior during cross-examination.  In total, Wiercinski invoked the Fifth Amendment at least twenty four times over the course of a brief cross-examination, including in response to questions as basic as whether or not he recalled giving prior deposition testimony.  *See* JA 127-129.

Mangia also attacked the credibility of Wiercinski's witnesses by impeaching their trial testimony with prior inconsistent deposition testimony.  *See, e.g.*, JA 182 (deposition testimony of Marian Krajewski stating that he could not remember instances of anti-Semitic slurs directed at Wiercinski); JA 202, 215-216 (deposition testimony of Marcin Swiderski and Jaroslaw Ubowski stating that

---

[2] The district court instructed the jury about the invocation of the Fifth Amendment as follows:

> During the course of the trial, you have heard Mr. Wiercinski assert the Fifth Amendment to a series of questions which were put to him.  You may, I suppose, during the course of your common experience and life, have heard references to a person taking the Fifth.  It is refusing to answer a question because the claim is that if I answered it I might be incriminating myself.  That's the basis of the Fifth Amendment.
>
> In a civil case when a person takes the Fifth Amendment, the jury has a right to infer – they may, but they are not required to infer – an adverse inference by virtue of the fact that the witness asserted the Fifth Amendment.  The jury may infer but they are not required to infer that the answer which the witness would have given, had he answered it, would have been unfavorable to him.

JA 345.

Wiercinski never complained to them about anti-Semitism). At the conclusion of plaintiff's case, Mangia moved for a directed verdict on the ground that Wiercinski's testimony was not credible, citing to the inconsistencies in his testimony and his pervasive invocation of the Fifth Amendment. The district court denied the motion because it was "based on questions of credibility," which are in the domain of the jury. JA 221.

Mangia introduced five witnesses in its case-in-chief. Robert Ranfranz, a former co-worker of Wiercinski's and Mangia's current director of operations, testified that he received a phone call from Wiercinski in August 2007, shortly before Wiercinski left the company and that he offered him a bribe. Specifically Wiercinski told Ranfranz that "he is not happy with the way that things are going at Mangia [or] Zbozien, and he said he is thinking about opening a case, suing the company, and he asked [Ranfranz] if [he] will testify for him. [Wiercinski] said that he will offer [Ranfranz] [one] thousand or $2,000 as an exchange, and that if he wins the lawsuit [they] can speak about additional money after the case." JA 225.

Zelmanovitch also testified about his extensive relationship with Wiercinski, and recalled that even though Wiercinski frequently spoke to him about work and compensation issues, he never mentioned that he was subject to anti-Semitic harassment at work. Zbozien testified and denied using anti-Semitic slurs against Wiercinski. Zbozien admitted that Cymanow transferred him to Mangia Wall Street for a brief period because of Wiercinski's complaints, but could not remember whether he knew at the time that those complaints alleged anti-Semitic remarks. Cymanow denied ever being told by Wiercinski of alleged anti-Semitic remarks, and claimed that she fired Wiercinski in 2007 because of job

7

performance issues and because he requested too much vacation time. Finally, another former deliveryman testified that he never heard Zbozien make anti-Semitic remarks, and that Wiercinski never complained to him about anti-Semitism in the office, even though they were both Jewish and discussed Jewish holidays and other topics.

The jury found Mangia liable under Section 1981, concluding on a special verdict form that Wiercinski was subjected to a hostile work environment based on conduct "perpetrated by his supervisor(s)" but not "perpetrated by his coworker(s)." The jury awarded Wiercinski nominal damages in the amount of $1 and punitive damages in the amount of $900,000. The verdict form did not require the jury to name which supervisor, or supervisors, subjected Wiercinski to a hostile work environment.[3] Following the verdict, Wiercinski applied for an award of attorneys' fees and costs, and Mangia moved, pursuant to Rules 50 and 59, for remittitur of the punitive damages award, or in the alternative, a new trial on the issue of punitive damages.

Although Mangia moved only for relief as to the punitive damages award, the district court vacated the jury's liability verdict, conditionally granted Mangia's motion for a new trial on the issue of punitive damages, and denied Wiercinski's application for fees and costs. *Wiercinski v. Mangia 57, Inc.*, 33 F. Supp. 3d 118 (E.D.N.Y. 2014). In reaching this decision, the district court concluded,

> [h]aving seen and heard the witnesses and having a firm hold on and not merely a feel, for every jot and title of this case, I am driven to the determination that a judgment entered for the defendant pursuant to Rule 50(b) notwithstanding the verdict, is

---

[3]     Neither party requested a more detailed verdict form or a jury instruction on the definition of "supervisor," which was the subject of the Supreme Court's decision in *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013).

> the only determination that reasonable and fair-minded persons could arrive at and to do less would be to endorse a gross miscarriage of justice.

*Id*. at 128. The district court found that Wiercinski's repeated invocation of the Fifth Amendment severely impacted his credibility and limited Mangia's opportunity to mount a defense. The district court was, no doubt, also deeply troubled by essentially unrebutted testimony that Wiercinski had offered to purchase the testimony of a witness. Further, the district court found the plaintiff's witnesses to be incredible, finding that "[t]heirs was the glib testimony of school witnesses reciting a lesson, a parody of Wiercinski's. The glaring inconsistencies between their testimony at trial and at depositions years earlier are vital to note for their relevance in arriving at a reasoned and comprehensive disposition . . . ." *Id*. at 134 (internal quotation marks omitted). The district court also concluded there was no evidence in the record to support a conclusion that Zbozien was a supervisor as that term has been defined by the Supreme Court. *See id*. at 136.

By contrast, the district court found the testimony of Mangia's witnesses to be more credible. Specifically, the district court noted that Cymanow had been family friends with Wiercinski for 30 years, and testified that she never directed or heard anyone direct any anti-Semitic remarks at Wiercinski at work. The district court also noted that Zelmanovitch testified that he knew Wiercinski for 25 years, and that Wiercinski had never told him that he was facing this kind of harassment at work, even though Wiercinski had come to him with many other problems over the years. *See id*. at 133. Finally, the district court cited evidence that Wiercinski stayed at the job for years, despite the allegedly hostile environment and in fact, asked to be assigned to the night shift where Zbozien is the

dispatcher, as undermining Wiercinski's testimony and supporting Mangia's witnesses. *See id.* at 134. Wiercinski filed a timely appeal from this decision.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to vacate a jury verdict pursuant to Rule 50(b). *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011). A judgment notwithstanding the verdict "'may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (quoting *Luciano v. Olsten Corp.*, 110 F.3d 210, 214 (2d Cir. 1997) (alterations in original)). "The motion should be granted only if the court can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party. The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005) (internal citation, quotation marks, and brackets omitted).

## DISCUSSION

### I.    Liability Verdict

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). "This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and

conditions of a contractual relationship, such as employment . . . ." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004). The same "core substantive standards that apply to claims of discriminatory conduct in violation of Title VII [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.] are also applicable to claims of discrimination in employment in violation of § 1981 . . . ." *Id*. at 225.

To prove a hostile work environment claim under Title VII, a plaintiff must show that his "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted). "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citation omitted). Relevant factors in determining whether the conduct is sufficiently pervasive "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

An employer's liability for hostile work environment claims depends on whether the underlying harassment is perpetrated by the plaintiff's supervisor or his non-supervisory co-workers. If the harassment is perpetrated by the plaintiff's "non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." *Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir.

11

2004). An employer is strictly liable for harassment perpetrated by a supervisor, unless the employer is able to establish an affirmative defense showing that it "exercised reasonable care to prevent and correct [] any . . . harassing behavior" and that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

In *Vance v. Ball State University*, the Supreme Court explained that an employee is a "supervisor" for purposes of the employer's vicarious liability under Title VII if he or she is empowered by the employer "to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" 133 S. Ct. 2434 , 2443 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In other words, a supervisor is an individual "'empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.'" *Id.* at 2448 (quoting *Ellerth*, 524 U.S. at 762) (emphasis omitted).

The district court "determined that a judgment should be entered for the defendant notwithstanding the verdict (pursuant to Rule 50(b)) because [it] ha[d] a feel of this case that is indelibly engraved upon [its] consciousness for having seen and heard the witnesses and with an awareness of the nuances of their testimony . . . ." *Wiercinski*, 33 F. Supp. 3d at 135. Although we fully understand the district court's concerns, we cannot agree with its explanation for vacating the liability verdict. This was a case based entirely on testimonial evidence from both parties. The district court was "required to consider the evidence in the light most favorable to the

party against whom the motion was made," and to "disregard all evidence favorable to the moving party that the jury is not required to believe." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001) (internal citations omitted) (emphasis omitted). Although the district court was justifiably concerned by what it correctly perceived to be troubling conduct by Wiercinski and his witnesses, the jury was properly instructed on how to consider Wiercinski's testimony in light of the invocation of the Fifth Amendment and chose to credit his version of the events, as well as the testimony of his witnesses. Given that testimony, the jury could rationally have concluded that Zbozien subjected Wiercinski to a hostile work environment. The district court's rejection of the jury's conclusion was essentially grounded in the type of evidence weighing and credibility determinations that are not permitted by Rule 50(b).

Alternatively, the district court found that the jury's verdict of supervisory liability could not be sustained because Zbozien was not a "supervisor" as defined by the Supreme Court in *Vance.* The district court held that Zbozien "was merely a dispatcher who assigned catering orders to individual delivery boys, one of whom was Wiercinski. Although these assignments could affect the amount earned in tips [because larger deliveries typically have larger tips], this is insufficient to establish supervisor status because such assignments do not constitute tangible employment action." *Wiercinski*, 33 F. Supp. 3d at 136 (internal citations and quotation marks omitted).

Similarly, in light of the circumstances of this case, we cannot accept this alternative basis. We need not determine whether Zbozien satisfies the *Vance* definition of "supervisor," because the district court failed to acknowledge that the jury's conclusion that the harassment was *not* perpetrated by co-workers is necessarily

based on its determination that Zbozien is a supervisor. Neither party requested an instruction as to the definition of "supervisor" under *Vance*, nor was the jury provided a list of potential supervisors or co-workers who allegedly harassed Wiercinski. Thus, even if the jury had been instructed that Zbozien could not be a "supervisor" as a matter of law, he certainly would have been a "co-worker." The jury could have credited Wiercinski's testimony that he informed Cymanow of the harassment and concluded that Mangia was vicariously liable for the harassing conduct of a *co-worker* (that is, Zbozien) because Cymanow, a supervisory agent of Mangia, knew, or should have known, of his conduct and failed to remedy the harassment. For these reasons, we reverse the district court's ruling insofar as it vacates the liability verdict and award of nominal damages in the amount of $1.

## II.    Punitive Damages

Punitive damages are "'a discretionary moral judgment' that the defendant has engaged in conduct that is so reprehensible that it warrants punishment." *Tolbert*, 242 F.3d at 77 (quoting *Smith v. Wade*, 461 U.S. 30, 52 (1983)). The showing required for an award of punitive damages is not the same as that required for liability. Rather, punitive damages may be awarded for claims of employment discrimination only where the employer "engaged in a discriminatory practice or discriminatory practices with *malice or reckless indifference* to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (emphasis added). The Supreme Court has explained that punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (quotation marks omitted).

"A plaintiff may establish the requisite state of mind for an award of punitive damages with evidence (1) that the defendant discriminated in the face of a perceived risk that its actions violated federal law, or (2) of egregious or outrageous acts that may serve as evidence supporting an inference of the requisite evil motive." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 427 (2d Cir. 2005) (internal quotation marks, citation, and brackets omitted). "[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with [federal law]." *Kolstad*, 527 U.S. at 545 (internal quotation omitted); *accord Carrion v. Agfa Constr., Inc.*, 720 F.3d 382, 387 (2d Cir. 2013) (affirming vacatur of punitive damages where the record lacked evidence "that defendant's conduct was driven by an evil motive or intent or that it involved a reckless or callous indifference to plaintiff's federally protected rights") (quotation mark omitted).

There is no evidence in the record that Mangia "discriminated (or retaliated) against [Wiercinski] with conscious knowledge it was violating the law, or that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn." *Tepperwien*, 663 F.3d at 573. The only conduct that can be imputed to Mangia that Wiercinski alleges was "malicious" or "recklessly indifferent" was Cymanow's alleged failure to act after Wiercinski complained to her about the discrimination. Even if this fact could establish an employer's liability for co-worker harassment, it does not, by itself, warrant an award of punitive damages.

Even if we credit Wiercinski's version of the facts, the remaining evidence shows that Wiercinski "was a friend of []

15

Cymanow's family for years, was a frequent visitor in her home, invited to participate on festive occasions[,] and was re-hired by her after he was discharged." *Wiercinski*, 33 F. Supp. 3d at 138. Additionally, Wiercinski was an employee of Mangia for over 20 years, during which period the company granted his requests to be transferred to more preferential locations and even his *own* request to continue to work on Zbozien's shift. When Wiercinski complained to Cymanow about Zbozien's conduct, she transferred Zbozien to a different location. After Zbozien returned, Cymanow granted Wiercinski's request to be transferred to a different shift. Even if these efforts were not sufficient to remedy the harassment, the evidence shows that, "[f]ar from acting maliciously or indifferently or egregiously," Mangia and Cymanow "sought to, and did, address [Wiercinski's] complaints in good faith." *Tepperwien*, 663 F.3d at 574. No reasonable jury could conclude that Mangia's conduct was "driven by an evil motive or intent, or that it involved a reckless or callous indifference to [Wiercinski's] federally protected rights." *Carrion*, 720 F.3d at 387 (internal quotation mark omitted). Given the high standard for punitive damages set forth in Section 1981a and by the Supreme Court in *Kolstad*, we affirm the district court's ruling to the extent it vacated the award of punitive damages.

### III. Attorneys' Fees and Costs

A plaintiff who recovers only nominal damages is still a prevailing party and may be entitled to fees and costs in Title VII cases. *Farrar v. Hobby*, 506 U.S. 103, 112-13 (1992) ("[A] plaintiff who wins nominal damages is a prevailing party under § 1988 [which permits recovery of attorney's fees in civil rights cases]. . . . A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's

16

benefit by forcing the defendant to pay an amount of money he otherwise would not pay."). Accordingly, we remand to the district court to determine what fees and costs, if any, Wiercinski may recover. Given the highly unusual facts of this case, the district court would be well within its discretion to conclude that this is a rare instance where a plaintiff who "formally prevails under § 1988 should receive no attorney's fees at all." *Id.* at 115 (internal marks omitted).

## CONCLUSION

For these reasons, we AFFIRM the district court's judgment to the extent that it vacates the award of punitive damages, REVERSE to the extent that it vacates the jury's finding of liability and award of nominal damages, and REMAND for determination of appropriate fees and costs.